# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

STATE OF WASHINGTON,                    )
                                        )  No. 71613-1-I
                Respondent,             )
                                        )  DIVISION ONE
        v.                              )
                                        )
MICHAEL ERIC ARMSTRONG,                 )  UNPUBLISHED OPINION
                                        )
                Appellant.              )  FILED: December 7, 2015

SPEARMAN, C.J. — Michael Eric Armstrong appeals his convictions for vehicular homicide and vehicular assault. He raises a number of objections to the admission of the results of the testing of his blood, including whether a warrant was required to (1) draw blood without his consent, and/or (2) test the blood for the presence of intoxicants. He also assigns error to the trial court's findings of fact and the enhanced sentence imposed because of his prior deferred prosecution for DUI. Finding no error, we affirm.

## FACTS

On February 19, 2012, at about 12:30 a.m., Michael Eric Armstrong drove through a stop sign and struck another vehicle, killing one of the passengers. Deputy Cory Stanton arrived on the scene and questioned Armstrong while he was sitting upright in the ambulance. The deputy smelled alcohol on Armstrong's breath. Deputy Stanton testified that he understood that Armstrong was to be taken to a hospital but he did not recall specific conversations about any injuries Armstrong may have sustained.

In Stanton's experience, once a suspect has been taken to a hospital, there would usually be a delay of about 30-40 minutes before blood could be drawn.

When Stanton learned that one of the passengers had died, he decided to do a "special evidence" blood draw under the implied consent statute.[1] He had given special evidence warnings before but had only once obtained a search warrant prior to giving such warnings. Stanton instructed a paramedic to draw Armstrong's blood at about 1:19 a.m. Armstrong remained on the scene for about 10-15 additional minutes and was then taken to a hospital about 10-15 minutes away.

Stanton believed that he was authorized to draw Armstrong's blood under the Special Evidence rules and the implied consent statute. He did not seek a warrant, but testified that based on experience, available equipment, reception, and procedures, it would have taken 1.5-2 hours to get a search warrant.

Armstrong's blood was not tested until February 27, 2012, eight days after seizure. The test revealed a blood alcohol concentration of 0.17 g/100 mL $\pm$.0.014. Id. Armstrong was charged with vehicular homicide and vehicular assault. He moved to suppress all evidence obtained from the blood draw and testing. At the suppression hearing, the trial court found sufficient exigent circumstances to uphold the warrantless search. Armstrong stipulated to facts that resulted in the trial court finding him guilty as charged of vehicular homicide and vehicular assault. The trial court sentenced him to concurrent standard range sentences of forty-one months for vehicular homicide and

---

[1]The version of RCW 46.20.308 in effect at the time established a statutory presumption that anyone arrested for driving under the influence of alcohol had consented to a breath or blood test for purposes of determining blood alcohol content. Before administering such a test, the arresting officer was required to advise the driver of his right to have additional tests administered by any qualified person of the driver's choosing. Id. A driver was to be apprised of this warning so that he would have the opportunity to gather potentially exculpatory evidence. State v. Morales, 173 Wn.2d 560, 570, 269 P.3d 263 (2012).

2

fourteen months for vehicular assault. Armstrong had previously been convicted of DUI in 1993 and received a deferred prosecution in 2005. Pursuant to RCW 9.94A.533(7), the trial court also imposed two consecutive twenty-four month periods of confinement, based on Armstrong's two prior offenses. Armstrong appeals.

## DISCUSSION

In reviewing the denial of a motion to suppress, we review challenged findings of fact for substantial supporting evidence, and conclusions of law de novo. State v. Mendez, 137 Wn.2d 208, 214, 970 P.2d 722 (1999). Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the finding. Id. We defer to the trial court on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), abrogated in part on other grounds, Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

Armstrong argues that his rights under the Fourth Amendment to the U.S. Constitution and article I, section 7 of the Washington Constitution were violated when his blood was drawn without a search warrant. The State contends the trial court properly found that exigent circumstances justified a warrantless seizure.

The Fourth Amendment and article I, section 7 prohibit warrantless searches and seizures unless an exception applies. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The taking of blood samples is a "search and seizure" for constitutional purposes. State v. Judge, 100 Wn.2d 706, 711, 675 P.2d 219 (1984); State v. Curran, 116 Wn.2d 174, 184, 804 P.2d 558 (1991) (citing State v. Meacham, 93 Wn.2d 735, 738, 612 P.2d 79555 (1980)). The State bears the burden of demonstrating that a

warrantless search or seizure falls within one of the exceptions to the warrant requirement. State v. Hendrickson, 129 Wn.2d 61, 71, 917 P.2d 563 (1996).

A warrantless search and seizure is constitutionally permissible if exigent circumstances exist. State v. Terrovona, 105 Wn.2d 632, 644, 716 P.2d 295 (1986); Missouri v. McNeely, __ U.S. __, 133 S.Ct. 1552, 1558-59, 185 L.Ed.2d 696 (2013). "The rationale behind the exigent circumstances exception 'is to permit a warrantless search where the circumstances are such that obtaining a warrant is not practical because the delay inherent in securing a warrant would compromise officer safety, facilitate escape or permit the destruction of evidence.'" State v. Smith, 165 Wn.2d 511, 517, 199 P.3d 386 (2009) (quoting State v. Cardenas, 146 Wn.2d 400, 405, 47 P.3d 1156 (2002)). A court must evaluate the totality of the circumstances in determining whether exigent circumstances exist. McNeely, 133 S.Ct. at 1556; Smith, 165 Wn.2d at 518. To support a finding of exigency, the circumstances must clearly demonstrate that the officer needed to act quickly. Cardenas, 146 Wn.2d at 408. Blood alcohol testing in particular requires consideration of the "the natural and inexorable dissipation of blood alcohol" levels over time, the gravity of the offense, and the relative availability of telephonic warrants. State v. Komoto, 40 Wn. App. 200, 211–14, 697 P.2d 1025 (1985). The natural dissipation of blood alcohol is but one factor in assessing the reasonableness of a warrantless blood draw. It is not a per se exigency. McNeely, 133 S.Ct. at 1561-63.

Here, the trial court reviewed the record and found that:

"[t]he time of day, the remoteness of the area, the lack of cell phone reception, the time that had already elapsed following the fatal collision, the fact that Deputy Stanton expected that Mr. Armstrong would be transported to a hospital imminently, the anticipated delay of at least an

hour and a half, and perhaps much longer, before a warrant could be obtained (assuming a judge could be located who would consider the warrant application), and the very real risk that any blood test results would be adulterated by fluids and/or mediations that Mr. Armstrong might be given at the hospital, created sufficient exigent circumstances in this case to permit the police to subject Mr. Armstrong to a warrantless blood draw."

CP at 32. Armstrong contends these findings are not supported by substantial evidence. We disagree.

Stanton testified that he arrived about 12:43 a.m., and that there were two or three officers on duty that night. Later, another deputy and two officers from the Muckleshoot tribe arrived. Stanton spoke with Deputy Pritchett when he arrived. After speaking with Armstrong, Stanton set up traffic control. He spoke with Sergeant Jencks about a blood draw around 1:00 a.m. Stanton did not know if anyone was available to have accompanied Armstrong to the hospital.

When Stanton learned that a passenger had died, he read Armstrong his constitutional rights and spoke with a paramedic about drawing his blood. At that time Armstrong was strapped to a gurney with tape over his head. Stanton testified that in his experience, paramedics usually try to get drivers from "a serious injury accident like that" to the hospital as quickly as possible. Verbatim Report of Proceedings (VRP) at 38.

Stanton also testified that once a defendant gets to the hospital and starts to receive medical treatment, that treatment may affect the accuracy of blood testing results. He testified that once a suspect has been taken to the hospital, there is usually a 30-40 minute time delay before blood can be drawn. Stanton testified that he did not have cell phone reception at the scene of the accident. In order to call for a warrant, he

5

would have had to radio dispatch, ask dispatch to call a judge, and contact the judge over the radio, all the while tying up the radio channel. Stanton estimated it would have taken an hour and a half to two hours at the very least to obtain a warrant. He also testified that the sheriff's office had a list of judges but he did not know if one would have been available at that time.

Based on this testimony, which the trial court found credible, we find that sufficient evidence supports the trial court's findings of fact. In addition, the totality of the circumstances, including the testimony in the record, the severity of the offense, the potential for medical treatment that would affect the blood alcohol content, and the difficulty of obtaining a warrant, support the trial court's conclusion that exigent circumstances existed to justify taking Armstrong's blood without a warrant.[2]

Next, Armstrong argues that even if exigent circumstances justified the warrantless search to obtain a sample of his blood, they do not justify a second warrantless search eight days later to determine the alcohol content of the sample. He argues that the primary justification for the initial search was that the alcohol content of his blood would naturally dissipate over time and thus result in the loss of that evidence. But once the blood had been collected, there was no evidence in the record of any risk that the alcohol content in Armstrong's blood sample would be lost. Under these circumstances, Armstrong contends there is no justification for the failure to obtain a warrant before conducting the analysis of his blood sample.

---

[2] Because we conclude that the blood draw was constitutional based on the presence of exigent circumstances, we do not consider the State's argument that it was also permissible based on a "good faith" exception to the warrant requirement.

The State does not dispute that there were no exigent circumstances present at the time the blood test was performed. Instead, it contests Armstrong's assertion that the search for the blood sample and the search of the sample are distinct events each requiring its own independent exception to the warrant requirement. The State argues that the extraction of a defendant's blood and subsequent testing is a single event and so long as the former is lawful, no further showing need be made as to the second. The State cites United States v. Snyder, 852 F.2d 471, 473 (9th Cir. 1988), where the Ninth Circuit observed that "[t]he flaw in Snyder's argument is his attempt to divide his arrest, and the subsequent extraction and testing of his blood, into too many separate incidents, each to be given independent significance for fourth amendment purposes." It concluded that so long as the initial extraction of the blood was lawful (there, pursuant to a search incident to a valid arrest) "the subsequent performance of a blood-alcohol test has no independent significance for fourth amendment purposes. . . ." Id. at 474. Similarly, in Schmerber v. California, 384 U.S. 757, 768, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the U.S. Supreme Court viewed the seizure and separate search of blood as a single event, considering whether "the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness." Id. at 768.

In support of his argument that the examination of his blood was a second search that required independent justification for an exception to the warrant requirement, Armstrong relied primarily on State v. Martines, 182 Wn. App. 519, 331 P.3d 105 (2014). There we held that "the testing of blood intrudes upon a privacy interest that is distinct from the privacy interests in bodily integrity and personal security that are

7

invaded by a physical penetration of the skin. It follows that the testing of blood is itself a search. . . ." Id. at 530. Accordingly, we concluded that because the warrant did not specifically authorize the blood test or limit the discretion to search the blood sample for evidence of alcohol or drugs, the blood test was an unlawful warrantless search. Id. at 532.

On appeal, however, the Supreme Court reversed our decision. See State v. Martines, 184 Wn.2d 83, 355 P.3d 1111 (2015). The court held that "a warrant authorizing extraction of a blood sample necessarily authorizes testing of that sample for evidence of the suspected crime." Id. at 1116. The court reasoned that because the purpose of the warrant was "to draw a sample of blood from Martines to obtain evidence of DUI," it was "not sensible to read the warrant in a way that stops short of obtaining that evidence." Id. at 1115.

Armstrong argues that the Supreme Court's holding in Martines is distinguishable and does not preclude his argument that the search of his blood was unlawful. He points out that in Martines a warrant was obtained, whereas in this case no court has ever authorized either the drawing or the testing of his blood. As we noted in Martines, 182 Wn. App. at 531, judicial scrutiny of government searches serves important purposes. It ensures that the requirement of probable cause is met and "that a search will be 'carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.'" (quoting Maryland v. Garrison, 480 U.S. 79, 84, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). Here, Armstrong does not dispute that there was probable cause to take the blood sample, but he contends that in the absence of a warrant, there were no express limits placed upon the

officer's discretion in conducting the search. We observed in <u>Martines</u> that limitless "[t]esting of a blood sample can reveal not only evidence of intoxication, but also evidence of disease, pregnancy, and genetic family relationships or lack thereof, conditions that the court in <u>Skinner v. Railway Labor Executives' Ass'n</u>, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989)] referred to as 'private medical facts.'" <u>Martines</u>, 182 Wn. App. at 530.

We think, however, that even in the absence of a warrant, the scope of the search is properly limited to the purpose for which the exception to the warrant requirement was applied. In <u>Martines</u>, even though the warrant did not explicitly authorize a test of the blood sample, our Supreme Court concluded that since the purpose of the warrant was to obtain evidence of intoxication, it made no sense to read the warrant in a way that did not permit that evidence to be obtained. Here, as in <u>Martines</u>, although there was no explicit judicial authorization of the blood test, it is sensible to conclude that an examination of Armstrong's blood sample for evidence of intoxication was permissible because that was the purpose of the search occasioned by the exigent circumstances. Because nothing in the record suggests that the search at issue here went beyond those common sense boundaries, we hold that on these facts testing Armstrong's blood sample for evidence of intoxication was lawful.[3]

Armstrong's next contention is that the trial court erred when it imposed an enhanced sentence based on a DUI deferred adjudication, because the deferred adjudication is not a conviction. We disagree and find that while a deferred prosecution

---

[3] In light of our disposition of this issue, we need not address the State's additional argument that once Armstrong's blood sample was lawfully in police custody, his expectation of privacy was so diminished that he retained no protectable interest under the federal or state constitutions.

is not a conviction, it still counts for sentencing purposes. When an individual convicted of DUI has had a prior offense within the previous seven years, the trial court is required to impose a higher minimum sentence. RCW 46.61.5055(2). Prior offenses for sentencing purposes include deferred prosecutions under the provisions of RCW 46.61.5055(14)(a)(xii).[4] Armstrong argues that under City of Kent v. Jenkins, 99 Wn. App. 287, 992 P.2d 1045 (2000), a deferred prosecution is not a conviction and must be found by a jury. The Jenkins court states that "a record of a DUI charge and deferred prosecution is not analogous to a prior conviction," and that "both the purposes and effects of deferred prosecutions differ from convictions." 99 Wn. App. at 289-90. While technically correct, this fact has no impact on the consideration of a deferred prosecution for sentencing purposes. A deferred prosecution is "a form of preconviction sentencing or probation under which an accused must allege under oath that the culpable conduct charged is the result of alcoholism, drug addiction, or mental problems." Jenkins, 99 Wn. App. at 290. The Jenkins court held that "under the statutory provisions applicable here, the courts have always taken into account deferred prosecutions for sentencing purposes." Jenkins, 99 Wn. App at 289.

Armstrong also argues that under State v. Drum, 168 Wn.2d 23, 31, 225 P3d 237 (2010), a defendant's stipulation to a legal conclusion is not binding. In that case, the state supreme court found that the trial court was required to hear Drum's sufficiency of the evidence claim on the merits, even though he stipulated to facts sufficient to find him guilty in a petition for a drug court program. Drum is distinguishable; here, the

---

[4] A "prior offense" includes "a deferred prosecution under chapter 10.05 RCW granted in a prosecution for a violation of RCW 46.61.502, 46.61.504, or an equivalent local ordinance." RCW 46.61.5055(14)(a)(xii).

sentencing enhancement is based on more than just Armstrong's admission of the facts in his petition for deferred prosecution. RCW 46.61.5055 specifically lists deferred prosecutions as a factor to be included in sentencing. We find that the trial court properly imposed a sentencing enhancement based on Armstrong's 2005 deferred prosecution.

Affirmed.

WE CONCUR:

Spearman, C.J.

Cox, J.

Lau, J.