IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69663-7-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| JOSE FIGEROA MARTINES, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: July 21, 2014 |

BECKER, J. — The extraction of blood from a drunk driving suspect is a search. Testing the blood sample is a second search. It is distinct from the initial extraction because its purpose is to examine the personal information blood contains. We hold that the State may not conduct tests on a lawfully procured blood sample without first obtaining a warrant that authorizes testing and specifies the types of evidence for which the sample may be tested.

The events leading to this appeal occurred on June 20, 2012. Appellant Jose Martines was observed driving his sport utility vehicle erratically on State Route 167. He veered into another car, careened across the highway, bounced off the barrier, and rolled over. Washington State Trooper Dennis Tardiff arrived and took Martines into custody. Martines smelled of intoxicants, had bloodshot and watery eyes, and stumbled while walking.

Trooper Tardiff sought a warrant to extract a blood sample from Martines. His affidavit of probable cause stated that a blood sample "may be tested to

determine his/her current blood alcohol level and to detect the presence of any drugs that may have impaired his/her ability to drive." He obtained a warrant that authorized a competent health care authority to extract a blood sample and ensure its safekeeping. The warrant did not say anything about testing of the blood sample.

Pursuant to the warrant, a blood sample was drawn from Martines at a local hospital. Then it was tested for the presence of drugs and alcohol. The test results indicated that Martines had a blood alcohol level of .121 within an hour after the accident and that the drug diazepam (Valium) was also present. Martines had a prior conviction for vehicular assault while driving under the influence. The State charged him with felony driving under the influence of an intoxicant, RCW 46.61.502(6)(b)(ii).

Martines moved to suppress evidence of drugs or drug testing. He argued there was no probable cause to support testing his blood for drugs because the witnesses observed only the signs and smells of alcohol. The trial court found that probable cause to test for alcohol included probable cause to test for drugs.

At trial, a toxicologist presented the results of the blood test. She testified that both alcohol and diazepam can affect driving ability.

To convict Martines as charged, one of the elements the jury had to find was that at the time of driving a motor vehicle, he:

> (a) was under the influence of or affected by intoxicating liquor or any drug; or
> (b) was under the combined influence of or affected by intoxicating liquor and a drug.

2

The prosecutor argued in closing that the blood test results confirmed the opinions of various witnesses who believed Martinez was intoxicated based on their observations at the scene. "You take a look at all of that together, and it's pretty clear the defendant was under the influence at that time, alcohol and drugs."

The jury returned a guilty verdict. Martines appeals.

On appeal, Martines briefly repeats his argument that without specific facts in the search warrant supporting a suspicion that Martines was affected by a drug, it was improper to admit the results of the laboratory tests for the presence of drugs. We do not address that argument in this opinion. The primary issue Martines raises on appeal is that testing a blood sample for any purpose is a search for which a warrant is required. Because the warrant authorizing the extraction of blood did not specifically authorize blood testing of any kind, Martines contends that the results should have been suppressed as the fruit of an illegal search. This additional issue is constitutional in nature, and therefore we consider it even though it is raised for the first time on appeal. RAP 2.5(a).

The State responds that a warrant is needed only for the extraction of blood and no further authority is needed to test the extracted sample. It is undisputed that the State had probable cause to suspect that Martines was driving under the influence of alcohol and that evidence of the crime could be found in his blood. In the State's view, once the police obtained a blood sample as authorized by the warrant, they could subject it to testing without any further

showing of probable cause and without a search warrant authorizing testing and particularly identifying the types of evidence for which the sample could be tested. The State asserts that blood is a thing to be seized, not a place to be searched, and once a blood sample is lawfully seized, the individual whose blood has been seized no longer has a constitutionally protected privacy interest in it.

The principal case upon which the State relies is State v. Cheatam, 150 Wn.2d 626, 81 P.3d 830 (2003). The defendant in Cheatam was suspected of rape. He was arrested on an unrelated charge and booked into jail. His clothing and personal effects were inventoried and stored in the jail's property room. A detective took his shoes from the property room and confirmed a visual match between the tread and a footprint near the site of the alleged rape. The State charged Cheatam with rape, the court admitted the shoe evidence at the trial, and Cheatam was convicted. He argued on appeal, unsuccessfully, that the shoe evidence should have been suppressed as the fruit of a warrantless search. Cheatam, 150 Wn.2d at 634. The court held that "once an inmate's personal effects have been exposed to police view in a lawful inventory search and stored in the continuous custody of the police, the inmate no longer has a legitimate expectation of privacy in the items free of further governmental intrusion." Cheatam, 150 Wn.2d at 638. It made no difference that an investigation was being conducted into a different crime than the one the inmate was arrested for "because one's privacy interest does not change depending on which crime is under investigation *once lawful exposure has already occurred.*" Cheatam, 150 Wn.2d at 642 (emphasis added).

4

The State here argues that blood, like shoes, belongs in the category of personal effects and police therefore have unlimited authority to subject a lawfully obtained blood sample to forensic testing for any purpose. The State contends our Supreme Court adopted that position when it applied Cheatam in State v. Gregory, 158 Wn.2d 759, 147 P.3d 1201 (2006). We believe the State reads Gregory too expansively.

In Gregory, the State drew the defendant's blood in connection with a rape investigation, pursuant to a court order authorized by CrR 4.7(b)(2)(vi) and supported by probable cause. By testing the blood sample, the State obtained Gregory's DNA (deoxyribonucleic acid) profile. Gregory did not challenge the reasonableness of the test that produced his DNA profile. Gregory, 158 Wn.2d at 822-23. Later, the State compared the DNA profile to DNA in semen collected from the scene of a murder. The result of this comparison implicated Gregory in the murder. He moved to suppress the use of the DNA evidence in the murder case. He asserted "an ongoing privacy interest in the characteristics of his DNA" such that the State was obligated to obtain a warrant to compare his DNA profile with material collected in connection with an unrelated crime. Gregory, 158 Wn.2d at 825-26.

The court rejected the argument that a warrant was necessary, following Cheatam and holding that Gregory's DNA profile was comparable to Cheatam's shoes:

> While unique requirements must be met to support a blood draw, Gregory has failed to adequately explain why, after the blood draw is complete, *a DNA profile that is lawfully in the State's possession* should be treated differently from other items of a

5

defendant's property with regard to subsequent criminal investigations. Gregory's blood *was drawn for the very purpose of conducting DNA analyses* and the resulting DNA profile was lawfully in the possession of police, regardless of which evidence that DNA profile was being compared against, swabs from R.S.'s rape kit or samples from the G.H. crime scene. Gregory does not point to any court that has concluded that *DNA evidence, lawfully in the possession of the State* for the purposes of one criminal investigation, cannot be compared with evidence collected for the purposes of an unrelated criminal investigation. We conclude that *once the suspect's DNA profile is lawfully in the State's possession,* the State need not obtain an independent warrant to compare that profile with new crime scene evidence.

Gregory, 158 Wn.2d at 827 (emphasis added) (footnote omitted).

What must be noted in the passage quoted above is that the item the court regarded as comparable to Cheatam's shoes was Gregory's DNA profile— not his blood. The court held that once the police lawfully obtained Gregory's DNA profile from his blood sample, they were free to compare *that profile* to DNA found during an investigation into a different crime. The court did not hold that the police were free to go back to the blood sample and test it for other types of information not contained in the DNA profile.[1] Gregory does not answer the question posed by Martines—whether a forensic test to acquire particular

---

[1] In a footnote to the passage from Gregory quoted above, the court cited cases from other jurisdictions in support of the conclusion that once a blood sample has been lawfully procured *for the purpose of DNA testing*, the police do not need an independent warrant to compare it to DNA evidence found at the scene of another crime. Gregory, 158 Wn.2d at 827 n.36, citing People v. King, 232 A.D.2d 111, 663 N.Y.S.2d 610, 614 (1997); Bickley v. State, 227 Ga. App. 413, 489 S.E.2d 167, 170 (1997); Wilson v. State, 132 Md. App. 510, 752 A.2d 1250, 1272 (2000). Arguably, King goes further and indicates that a blood sample, lawfully seized for any purpose at all, is no different from lawfully seized items of tangible property such as a gun or a controlled substance. King, 232 A.D.2d at 117. We are not persuaded by that reasoning, and we do not read Gregory as going that far.

information from a blood sample is itself a search separate from the drawing of the sample.

That question is also unanswered by the next case on which the State relies, State v. Athan, 160 Wn.2d 354, 158 P.3d 27 (2007). In Athan, the court held that the defendant abandoned any expectation of privacy he may have had in his saliva when he unwittingly but voluntarily mailed to detectives an envelope he had licked. Athan, 160 Wn.2d at 374. Martines did not voluntarily give up his blood sample or any expectation of privacy he had in its contents.

In Athan, the court declined to address an argument by amicus curiae American Civil Liberties Union that "DNA should constitute a privacy interest" because of its potential to reveal a vast amount of personal information, including medical conditions and familial relations. Athan, 160 Wn.2d at 368. The court stated that the concern raised by amicus, "while valid," was not present because the State had used the saliva sample only for identification purposes, not to investigate more personal matters. Athan, 160 Wn.2d at 368. Here, the State suggests that this court can similarly avoid addressing whether there is a privacy interest in blood because the blood sample was used only to investigate whether Martines was guilty of driving under the influence, not to test for unrelated personal information. But in this case, we cannot avoid deciding whether testing of blood is a separate search distinct from drawing of blood. The issue determines the outcome. The importance of deciding it is heightened by the fact that the exigency exception to the Fourth Amendment no longer categorically applies in drunk driving investigations. Missouri v. McNeely, __ U.S. __, 133 S.

7

Ct. 1552, 1555, 185 L. Ed. 2d 696 (2013). Warrants for testing the blood of drunk driving suspects will now become more prevalent. Law enforcement officers who seek warrants and judges who issue them need guidance as to what these warrants must authorize.

If a government action intrudes upon an individual's "reasonable expectation of privacy," a search occurs under the Fourth Amendment. Katz v. United States, 389 U.S. 347, 360-61, 88 S. Ct. 507, 19 L. Ed. 576 (1967) (Harlan, J., concurring). When the government disturbs those privacy interests that citizens of the state have held, and should be entitled to hold, safe from governmental trespass absent a warrant, a search occurs under article I, section 7 of the Washington Constitution. State v. Myrick, 102 Wn.2d 506, 511, 688 P.2d 151 (1984).

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Schmerber v. California, 384 U.S. 757, 767, 86 S. Ct. 1826, 1834, 16 L. Ed. 2d 908 (1966). In the context of determining what limitations the Fourth Amendment imposes upon intrusions into the human body, limitations on the kinds of property which may be seized under warrant "are not instructive." Schmerber, 384 U.S. at 768. Similarly, the examinations that may be made of shoes and other personal effects are not instructive when determining whether limitations on the testing of blood are required by the Fourth Amendment or article I, section 7.

In light of our society's concern for the security of one's person, it has long been recognized that a compelled intrusion into the body for blood to be

8

analyzed for alcohol content is a search. <u>Skinner v. Ry. Labor Exec's. Ass'n</u>, 489 U.S. 602, 616, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989), citing <u>Schmerber</u>, 384 U.S. at 767-68; <u>State v. Judge</u>, 100 Wn.2d 706, 711, 675 P.2d 219 (1984) (following <u>Schmerber</u>). "It is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." <u>Skinner</u>, 489 U.S. at 616. According to <u>Skinner</u>, the testing of the blood constitutes a second search. "The ensuing chemical analysis of the sample to obtain physiological data *is a further invasion* of the tested employee's privacy interests." <u>Skinner</u>, 489 U.S. at 616 (emphasis added).

Following <u>Skinner</u>, this court has held that in the context of government employment, the collection and testing of urine invades privacy in at least two distinct ways:

> The invasion in fact is twofold: first, the taking of the sample, which is highly intrusive, and second, the chemical analysis of its contents—which may involve still a third invasion, disclosure of explanatory medical conditions or treatments.

<u>Robinson v. City of Seattle</u>, 102 Wn. App. 795, 822 n.105, 10 P.3d 452 (2000).

The State does not discuss <u>Skinner</u> and <u>Robinson</u>. The State contends, however, that under <u>Schmerber</u>, the right to seize blood from a drunk driving suspect encompasses the right to conduct a blood-alcohol test at some later time. For this proposition, the State relies on <u>United States v. Snyder</u>, 852 F.2d 471, 474 (9th Cir. 1988). In <u>Snyder</u>, a drunk driving case, blood was drawn without a warrant under the exigency exception to the Fourth Amendment. The defendant argued that police had to seek a warrant for testing after the blood had

been extracted. The court rejected the argument and explained that the seizure and testing of the blood amounted to "a single event" under Schmerber:

> The flaw in Snyder's argument is his attempt to divide his arrest, and the subsequent extraction and testing of his blood, into too many separate incidents, each to be given independent significance for fourth amendment purposes. He would have us hold that his person was seized when he was arrested, his blood was seized again upon extraction at the hospital, and finally his blood was searched two days later when the blood test was conducted. It seems clear, however, that Schmerber viewed the seizure and separate search of the blood as a single event for fourth amendment purposes.

Snyder, 852 F.2d at 473-74.

Snyder does not control our analysis in this case. The court did not consider whether the Fourth Amendment permits a per se rule allowing unlimited testing upon a lawfully obtained blood sample. The State's argument in this case demands just such a per se rule. In addition, because the blood was drawn under the exigency exception to the warrant requirement, the Snyder court did not consider whether a warrant that expressly authorizes a blood draw should also expressly authorize and limit the purposes for which testing can be conducted. Finally, Skinner had not yet been decided and the Snyder court did not have a precedent indicating that chemical analysis of blood is an independent invasion of privacy.

Physical characteristics which are knowingly exposed to the public are not subject to Fourth Amendment protection. Katz, 389 U.S. at 351; Athan, 160 Wn.2d at 374. Thus, one has no reasonable expectation of privacy in one's voice, fingerprints, handwriting, or facial characteristics. United States v. Dionisio, 410 U.S. 1, 14, 93 S. Ct. 764, 771, 35 L. Ed. 2d 67 (1973) ("No person

can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world.")

Blood is not like a voice or a face or handwriting or fingerprints or shoes. The personal information contained in blood is hidden and highly sensitive. Testing of a blood sample can reveal not only evidence of intoxication, but also evidence of disease, pregnancy, and genetic family relationships or lack thereof, conditions that the court in Skinner referred to as "private medical facts." Skinner, 489 U.S. at 617. Citizens of this state have traditionally held, and should be entitled to hold, this kind of information safe from governmental trespass.

Consistent with Skinner and Robinson, we conclude the testing of blood intrudes upon a privacy interest that is distinct from the privacy interests in bodily integrity and personal security that are invaded by a physical penetration of the skin. It follows that the testing of blood is itself a search, and we so hold.

Because the testing of blood is a search, a warrant is required. Riley v. California, No. 13–132, slip op. at 5 (S. Ct. June 25, 2014) (where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, reasonableness generally requires the obtaining of a judicial warrant). There are two distinct constitutional protections served by the warrant requirement. Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S. Ct. 2022, 2038-39, 29 L. Ed. 2d 564 (1971). First, the magistrate's scrutiny is intended to eliminate altogether searches not based on probable cause. The second, distinct

objective is that those searches deemed necessary "should be as limited as possible" so as to prevent the "rummaging in a person's belongings" that the colonists so abhorred. Coolidge, 403 U.S. at 467. The particularity requirement serves this second objective. A warrant ensures that a search will be "carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Maryland v. Garrison, 480 U.S. 79, 84, 107 S. Ct. 1013, 94 L. Ed. 2d 72 (1987). A properly particularized warrant serves the dual function of limiting the executing officer's discretion and informing the person subject to the search what items the officer may seize. State v. Riley, 121 Wn.2d 22, 29, 846 P.2d 1365 (1993).

Where the State has probable cause to suspect driving under the influence, the requirement to obtain a particularized warrant for blood testing will prevent the State from rummaging among the various items of information contained in a blood sample for evidence unrelated to drunk driving. For example, when a blood sample is obtained in the course of investigating driving under the influence, the State may not—without further warrant—use the sample to produce a DNA profile that can be added to government data banks.

Here the warrant obtained by the trooper could easily have been written to authorize testing the blood for evidence of alcohol and drug intoxication, but it contained no such language. As written, the warrant did not authorize testing at all. It did not limit the trooper's discretion to searching the blood sample only for evidence of alcohol or drugs. Nor did it serve to inform Martines that the testing

12

would be limited to evidence of alcohol or drug consumption.[2] The testing that occurred in the toxicology lab was a warrantless search.

We presume that a warrantless search violates both the Fourth Amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution. State v. Day, 161 Wn.2d 889, 893, 168 P.3d 1265 (2007). The State can rebut the presumption by showing that an exception to the warrant requirement applies. Day, 161 Wn.2d 894. The State does not claim there is an exception to the warrant requirement that would apply in this case. Because the blood test results were obtained without a warrant, they should have been suppressed. State v. White, 97 Wn.2d 92, 640 P.2d 1061 (1982).

Error in admitting evidence obtained through an unconstitutional search is subject to the constitutional harmless error test of Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). State v. Peele, 10 Wn. App. 58, 66, 516 P.2d 788 (1973), review denied, 83 Wn.2d 1014 (1974). Constitutional error is presumed to be prejudicial and the State bears the burden of proving that the error

---

[2] An overbroad warrant may be cured where the affidavit and the search warrant are physically attached and the warrant expressly refers to the affidavit and incorporates it with "'suitable words of reference.'" Riley, 121 Wn.2d at 29, quoting Bloom v. State, 283 So.2d 134, 136 (Fl. Dist. Ct. App. 1973). Though the issue was not briefed, we have considered whether the deficiencies in the warrant can be cured by recourse to the probable cause affidavit. The affidavit states that a sample of blood from Martines "may be tested to determine his/her current blood alcohol level and to detect the presence of any drugs that may have impaired his/her ability to drive," and the warrant incorporates by reference the testimonial evidence given to the court. But it is not clear in the record that the affidavit was physically attached to the warrant. The State has not briefed the case under Riley and has not asked us to affirm the conviction on that narrow technical ground.

was harmless. <u>State v. Watt</u>, 160 Wn.2d 626, 635, 160 P.3d 640 (2007). The State does not offer a harmless error analysis. Presenting the test results was a major focus of the trial, and the prosecutor relied on them in closing. Under the circumstances, we cannot conclude the admission of the alcohol and drug test results was harmless.

The conviction is reversed.

Becker, J.

WE CONCUR:

Cox, J.

Dwyer, J.