# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THE STATE OF WASHINGTON, )
                ) DIVISION ONE
       Appellant, )
                ) No. 74633-2-I
      v. )
                ) UNPUBLISHED OPINION
JEFFREY ISAAC SCHENCK, )
                )
       Respondent. ) FILED: February 21, 2017
_____ )

DWYER, J. — The State of Washington appeals from an order dismissing a charge of unlawful possession of a firearm in the first degree against Jeffrey Schenck. The State contends that the trial court erred by ruling that the warrant authorizing a search of Schenck's residence for evidence of his son's crimes and the seizure of locked containers located therein did not authorize the police to search a locked cabinet discovered in his bedroom. We agree.

Pursuant to our Supreme Court's decision in State v. Figeroa Martines, 184 Wn.2d 83, 355 P.3d 1111 (2015), a warrant authorizing seizure of an item also authorizes a search of that item when such a search is necessary to determine the item's evidentiary significance. Accordingly, the warrant here at issue authorized the police to search the locked cabinet because such a search was necessary to determine the evidentiary significance of the items contained

therein. The trial court thus erred by granting Schenck's suppression motion and dismissing the charge against him. We reverse.

I

Schenck shared a multi-bedroom residence with Jeremy Schenck, his son.[1] In early 2015, law enforcement officers investigated several crimes believed to have been committed by Jeremy. The investigation culminated in warrants being issued for Jeremy's arrest. Upon execution of the warrants, the investigating officers discovered evidence of criminal activity on Jeremy's person, in his car, and on his cell phone.

Based on this evidence, a request was made and a warrant was obtained authorizing a search of the Schenck residence for evidence of seven crimes: unlawful possession of a controlled substance, unlawful possession of drug paraphernalia, mail theft, identity theft in the second degree, forgery, and unlawful possession of stolen property in the second and third degree. The warrant authorized law enforcement officers to:

> *Seize*, if located, the following property or person(s):
> Any illegally possessed controlled substances, narcotic paraphernalia, mail, access devices, payment instruments, financial documents, pawn slips, records, papers of ownership, receipts, scales, ledgers, proceeds, *locked containers*, and items used for the sale and transport of illegal drugs.

(Emphasis added.)

Upon execution of the warrant, the investigating officers entered the residence and searched the rooms within. While in a room determined to be

---

[1] Jeffrey Schenck and Jeremy Schenck share a last name. Our references to Schenck refer to Jeffrey Schenck.

Schenck's bedroom, the officers encountered a locked metal cabinet in a closet. An officer breached the lock on the cabinet and discovered several firearms inside.

Because Schenck was barred from possessing firearms due to a prior felony conviction, he was arrested a few days later. Upon his arrest, Schenck made several statements to the arresting officers, avowing that he intended to have his right to possess firearms restored, claiming that the bedroom in which the firearms were found was not his bedroom, and disclaiming ownership of the firearms. Nevertheless, Schenck was charged with one count of unlawful possession of a firearm in the first degree, in violation of RCW 9.41.040(1).[2]

Prior to trial, the State indicated that it planned to present evidence of the firearms located in the locked cabinet and Schenck's statements to the arresting officers. Schenck moved to suppress this evidence, claiming that the warrant authorized only seizing—not searching—locked containers. Because the warrant did not authorize a search of the cabinet, Schenck argued, obtaining another search warrant was a necessary predicate to a lawful search of the locked cabinet in his bedroom. Thus, Schenck argued, the officers' search of the cabinet was, in fact, an unlawful warrantless search and any evidence garnered therefrom was required to be excluded from trial. The trial court granted Schenck's motion. The State moved for reconsideration, which the trial court

---

[2] RCW 9.41.040 reads, in pertinent part:
(1)(a) A person, whether an adult or juvenile, is guilty of the crime of unlawful possession of a firearm in the first degree, if the person owns, has in his or her possession, or has in his or her control any firearm after having previously been convicted or found not guilty by reason of insanity in this state or elsewhere of any serious offense as defined in this chapter.

- 3 -

denied. Schenck then moved to dismiss the State's case, a motion the trial court granted.

II

The State contends that the trial court erred by ruling that the search warrant, which authorized the seizure of locked containers, did not also authorize a search of those containers, once seized. We agree.

Our analysis is controlled by State v. Figeroa Martines, 184 Wn.2d 83. In that case, Figeroa Martines was suspected of driving under the influence and a warrant was issued authorizing the seizure of a sample of his blood. Figeroa Martines, 184 Wn.2d at 88. The warrant did not expressly authorize a search of the blood sample, once seized. Figeroa Martines, 184 Wn.2d at 88.

In proceedings before this court, Figeroa Martines argued that an additional search warrant was required for the police to lawfully test the blood sample. State v. Figeroa Martines, 182 Wn. App. 519, 523, 331 P.3d 105 (2014). This was so, he argued, because testing the blood constituted a search not authorized by the warrant authorizing seizure of a sample of his blood. Figeroa Martines, 182 Wn. App. at 523. In response, the State contended that the warrant authorized the test of the blood sample because, once lawfully seized pursuant to the warrant, Figeroa Martines no longer had a constitutionally protected privacy interest in the blood sample. Figeroa Martines, 182 Wn. App. at 523-24. We agreed with Figeroa Martines. In so ruling, we focused on the wording of the warrant, noting that it "authorized a competent health care authority to extract a blood sample and ensure its safekeeping. The warrant did

- 4 -

not say anything about testing of the blood sample." Figeroa Martines, 182 Wn. App. at 522. Indeed, "[a]s written, the warrant did not authorize testing at all." Figeroa Martines, 182 Wn. App. at 531. Thus, we held that "the testing of blood is itself a search," Figeroa Martines, 182 Wn. App. at 530, and was an illegal warrantless search because it was not authorized by the warrant issued. Figeroa Martines, 182 Wn. App. at 531-32.

Our Supreme Court reversed, ruling that a warrant authorizing seizure of blood for the purpose of DUI testing also authorized a search of the blood sample because such a search was necessary to determine the evidentiary value of the blood sample:

> The warrant in this case authorized the "extract[ion]" of a blood sample from Martines, indicating probable cause existed to believe his blood contained evidence of DUI. . . . The purpose of the warrant was to draw a sample of blood from Martines to obtain evidence of DUI. It is not sensible to read the warrant in a way that stops short of obtaining that evidence. A warrant authorizing a blood draw necessarily authorizes blood testing, consistent with and confined to the finding of probable cause. The only way for the State to obtain evidence of DUI from a blood sample is to test the blood sample for intoxicants. See State v. Grenning, 142 Wn. App. 518, 532, 174 P.3d 706 (2008) ("[I]t is generally understood that a lawful seizure of apparent evidence of a crime using a valid search warrant includes a right to test or examine the seized materials to ascertain their evidentiary value."), aff'd, 169 Wn.2d 47, 234 P.3d 169 (2010).
>    The court erred in concluding the warrant was fatally deficient. The warrant in this case was supported by probable cause to believe Martines's blood contained evidence of DUI. We apply a commonsense reading to the warrant and conclude it authorized not merely the drawing and storing of a blood sample but also the toxicology tests performed to detect the presence of drugs or alcohol.

Figeroa Martines, 184 Wn.2d at 93 (alterations in original).

When applying the holding of <u>Figeroa Martines</u> to this case, the result is clear. The magistrate herein issued a warrant authorizing a search of the Schenck residence for evidence of Jeremy's crimes. This authorization included the seizure of locked containers found therein. Just as the untested blood sample had no evidentiary significance, so did the locked container—in and of itself—lack evidentiary significance. Only by testing the blood or opening the container could the evidentiary significance of the item authorized to be seized be determined. Opening the cabinet was necessary to "'ascertain the[] evidentiary value'" of whatever was found inside. <u>Figeroa Martines</u>, 184 Wn.2d at 93 (quoting <u>Grenning</u>, 142 Wn. App. at 532). Because a seizure of the locked cabinet was authorized by the warrant, so was the opening of the container authorized. The trial court erred by ruling otherwise.

### III

Both the state and federal constitutions require that the police "'execute a search warrant strictly within the bounds set by the warrant.'" <u>Figeroa Martines</u>, 184 Wn.2d at 94 (quoting <u>State v. Kelley</u>, 52 Wn. App. 581, 585, 762 P.2d 20 (1988) (citing <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388, 394, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971))). The bounds of the warrant are defined by the issuing magistrate, who, "alone, is clothed with the power to authorize an intrusion into a constitutionally protected area and a seizure of evidence found therein." <u>State v. Daugherty</u>, 22 Wn. App. 442, 446, 591 P.2d 801 (1979) (citing <u>McDonald v. United States</u>, 335 U.S. 451, 455-56, 69

S. Ct. 191, 93 L. Ed. 153 (1948)), aff'd, 94 Wn.2d 263 (1980). This arrangement is no mere formality:

> The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. . . . And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home.

McDonald, 335 U.S. at 455-56.

Our Supreme Court has instructed that the purposes underlying the particularity requirement applicable to search warrants include "'prevention of general searches'" and "'prevention of the seizure of objects on the mistaken assumption that they fall within the issuing magistrate's authorization.'" State v. Besola, 184 Wn.2d 605, 610, 359 P.3d 799 (2015) (quoting State v. Perrone, 119 Wn.2d 538, 545, 834 P.2d 611 (1992)).[3] The lawful authority to intrude into a protected area pursuant to a warrant arises not from any subjective belief held by an officer executing the warrant but, rather, from the objective determination by a magistrate that a search or seizure is warranted—a determination that inheres in the warrant, as worded. Thus, "the scope of a search conducted pursuant to a warrant is defined *objectively* by the terms of the warrant and the evidence sought, not by the *subjective* motivations of an officer." United States v. Williams, 592 F.3d 511, 522 (4th Cir. 2010).

---

[3] The purposes also include "'prevention of the issuance of warrants on loose, vague, or doubtful bases of fact.'" Besola, 184 Wn.2d at 610 (quoting Perrone, 119 Wn.2d at 545).

Here, the trial court reviewed the officers' search of the locked cabinet and concluded:

> 1. Because law enforcement officers believed, based upon their investigation, that the [locked cabinet] belonged to the defendant at the time they searched the room and because they subjectively believed the [locked cabinet] would contain firearms, officers had a duty to obtain a separate warrant to breach the [locked cabinet] and search it.
> 2. All firearms seized from the locked cabinet were thus seized without lawful authority and are hereby suppressed.

To the contrary, the opening of the locked cabinet was a warranted search. The magistrate issued a warrant that authorized a search of the residence. The warrant further authorized the seizure of locked containers located within the residence. Pursuant to Figeroa Martines, the warrant thus authorized a search of locked containers found within the residence. And, based on the wording of the warrant, "locked containers" clearly encompassed the locked cabinet found therein.

By searching the locked cabinet, the officers executed the "'search warrant strictly within the bounds set by the warrant.'"[4] Figeroa Martines, 184 Wn.2d at 94 (quoting Kelley, 52 Wn. App. at 585). Accordingly, the search of the locked cabinet was lawful.

_____

[4] The difficulty with the trial court's analysis is illustrated by a simple hypothetical: what if, in addition to firearms, the police, in searching the cabinet, had also discovered a ledger setting forth financial information related to Jeremy's purchase or sale of illegal drugs? Pursuant to the trial court's analysis, in a subsequent prosecution of Jeremy, the absence of a second warrant (authorizing a search of the locked container) would necessitate suppression of the ledger.

But such a result would be illogical and unjust. After all, the officers' motivation for obtaining the warrant was, in large part, to search for evidence of such drug dealing. And the magistrate—in the warrant issued—specifically authorized the search for (and seizure of) such ledgers.

In the end, whether the search was lawful depends on the authority warranted, not on the type of contraband discovered. If, pursuant to the warrant issued, the police could lawfully search the cabinet and seize such a ledger, so could they lawfully search the cabinet even if no such ledger was found.

IV

The State next asserts that the firearms located within the cabinet were lawfully seized pursuant to the plain view doctrine. We take no position on this assertion.

The State concedes that the trial court did not rule on this issue. We do not know whether additional findings of fact would have been made by the trial court were it to have ruled on this issue. We do not know whether the trial court would have considered the testimony and evidence at the hearing sufficient to decide the issue. The parties are free to litigate this issue on remand. [5]

Reversed and remanded for further proceedings.

We concur:

---

[5] To the extent that the trial court's order excluding certain statements made by Schenck was predicated on its ruling regarding the search of the cabinet, that order is reversed as well.

Given our resolution of the foregoing issues, the remaining issues raised by the State need not be addressed.